Formatted for Electronic Distribution                                              Not for Publication

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

_____

In re:                                                                                                       Filed & Entered
    **Burton A. Dudding,**                    **Chapter 13 Case**            On Docket
         **Debtor.**                               **# 10-10557**                 March 29, 2011

_____

*Appearances:*    *Rebecca A. Rice, Esq.*                         *Hobart F. Popick, Esq.*
                              *Rutland, VT*                                    *Burlington, VT*
                              *Attorney for Burton A. Dudding*                *Attorney for Georgia S. Burke*

**MEMORANDUM OF DECISION**
**G<small>RANTING</small> R<small>ELIEF FROM</small> S<small>TAY</small>**

      The Debtor's ex-wife has filed a motion for relief from stay seeking authorization to enforce provisions in the parties' divorce agreement that authorize her to obtain a qualified domestic relations order, and potentially to collect alimony, if the Debtor fails to pay the joint debts he assumed as part of the allocation of assets and liabilities in their divorce.  There is no dispute either that the Debtor has not paid the subject debt or that the stay does not apply if the debt in question is a domestic support obligation.  For the reasons set forth below, the Court finds that the debt in question is a domestic support obligation and that the automatic stay therefore does not preclude the Debtor's ex-wife from proceeding to collect this debt from non-estate assets by a qualified domestic relations order, and grants the movant's motion.

J<small>URISDICTION</small>

      This Court has jurisdiction over the instant motion pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(G).

F<small>ACTS AND</small> P<small>ROCEDURAL</small> H<small>ISTORY</small>

      The pertinent facts are not in dispute.  Burton Dudding (the "Debtor") and Georgia S. Burke (f/k/a Georgia S. Dudding) ("Ms. Burke") were divorced on June 14, 2004, as memorialized by the Findings of Fact, Conclusions of Law, and Decree of Divorce entered by the Family Division of the Second Judicial District Court of the State of Nevada in and for the County of Washoe, of even date (the "Divorce Decree") (doc. # 22, Ex. 1).  The Divorce Decree incorporated the parties' Marital Settlement Agreement, dated May 28, 2004 (the "Agreement") (doc. # 22, Ex. 1).  The Divorce Decree concluded that the Agreement "settles all property, debts and spousal support from the marriage.  Said Agreement is fair, just

1

and equitable."

The relevant provisions of the Agreement provide as follows:

    **I. GENERAL FACTS**

* * *

    D. **Purpose of the Agreement**. The parties seek by this Agreement to completely settle and adjust the rights, duties and obligations existing between them by virtue of their relationship as Husband and Wife, as well as all matters relating to child support, custody, visitation, spousal support and maintenance, and any other matter arising by virtue of the marriage. They further seek to so settle and adjust the following:

* * *

    **II. PROPERTY AND DEBTS**

    A. **Community Property and Debts**. The Parties have acquired community property and debts during their marriage, and have agreed to a division of this property.  It is their final agreement as to the character and division of the property.  The parties acknowledge and agree that the value of any asset or liability may increase or decrease prior to the time of actual distribution, due to market conditions, or for other reasons.  Each party shall receive the asset or liability designated as his or hers with all increases or diminutions from the date of execution (or as close thereto as possible) to the date of distribution attributable to his or her portion of that asset . . .

        1. **Husband**. The community property and debts set over to Husband are listed on Exhibit A, a balance sheet describing and distributing the community and personal property thereon (Hereinafter, Exhibit A).

        Said property and debts shall be the sole and separate property and obligations of Husband, and Wife hereby releases any and all rights thereto.  Further, the parties agree either may remove the name of the other from any debt set over to him.

        2. **Wife.** The community property and debts set over to the Wife are listed on Exhibit A.

        Said property and debts shall be the sole and separate property and obligations of Wife, and Husband hereby releases any and all rights thereto.  Further, the parties agree either may remove the name of the other from any debt set over to him.

* * *

    C. **Transfer Subject to Encumbrance**.  Unless specifically set forth on Exhibit "A," [sic] all property is transferred subject to and with all existing indebtedness, encumbrances and liens thereon or arising directly therefrom.  Wife shall refinance the marital residence within 60 days of execution of this Agreement and hold Husband harmless from any indebtedness thereon.

2

Husband shall make a good faith attempt to refinance all outstanding debt which he assumes pursuant to Exhibit A.  Husband shall purchase a decreasing life insurance term policy payable to Wife with an initial face value of $95,000 to pay off the debt he assumes pursuant to Exhibit A, which shall remain in full force and effect until Husband refinances or pays such debt in his name only.  Husband shall take such steps as are necessary to close the accounts which he assumes and shall not increase the sums owed thereon from the amounts set forth.

D. **Equalizing Payments**. To equalize the imbalance created by the division of community assets, Husband shall set over to Wife from his TIAA-Cref [sic] account (line #40) the sum of $600,000, subject to final valuation of Husband's and Wife's TIAA-Cref [sic] accounts and market valuation changes on final distribution as described in Sec. 2(A). (Stated in percentages: Husband shall receive 54.97% of line #40 and Wife shall receives 45.03%.)  Wife shall have the option of creating an IRA account into which to receive the sum, or causing the sum to be set over to her own TIAA-Cref [sic] account.

All TIAA-CREF distributions in any division hereunder shall be allocated to each party ratably and shall be in the form most fair and equitable to both parties, with due consideration to risk, growth and liquidity.  Wife understands she will not be named as a beneficiary under Husband's remaining TIAA-CREF benefits.

\* \* \*

H. **Duty to Defend and Hold Harmless**. If any claim, action or proceeding is brought seeking to hold one party liable on account of any undertaking, debt, obligation, liability, act or omission which, under this agreement, is assumed by the other party, the other party will, at his or her sole expense, defend the other against any such claim or demand and that he or she will indemnify, defend and hold harmless the other party.  Further, the divorce court shall retain limited jurisdiction to adjudicate such an event where the non-assuming party is forced to pay a debt assumed by the other under this agreement.  Such remedies include, but are not limited to, a qualified order as to a party's retirement benefits in order to pay such debt.  The parties agree that the use of a qualified domestic relations order shall be the first remedy sought, and no claim for spousal support under Section K, below, may be asserted until a remedy under this paragraph has been exhausted.

\* \* \*

K. **Bankruptcy**.

  **1. Recital**. The parties recite as a fact on which both rely as an inducement to execution of this Agreement that neither intends to seek the protection of the bankruptcy laws after the effective date of this agreement.

  **2. Modification or creation of alimony right**. Besides all rights at law or

3

> hereunder, if a party seeks protection under the bankruptcy laws (or state equivalent) or seeks to or does discharge any indebtedness hereunder ("party seeking protection"), and that causes a third party to make a claim against or collect from the other on a debt which the party seeking protection undertakes herein to pay, that action shall have the following results: the duty to pay alimony shall arise thereby. ***The parties agree that the use of a qualified domestic relations order shall be the first remedy sought, and no claim for spousal support under this Section, may be asserted until a remedy under Section H above has been exhausted.***
>
> **3. No waiver if protection sought**. No waiver of spousal support or alimony in this agreement is effective if a party seeks protection under the bankruptcy laws (or state equivalent) or seeks to or does discharge any indebtedness hereunder ("party seeking protection"), and that action causes a third party to make a claim against or collect from the other on a debt which the party seeking protection undertook herein to pay. If a claim or collection is made, a claim for spousal support/alimony shall arise upon such event. ***The parties agree that the use of a qualified domestic relations order shall be the first remedy sought, and no claim for spousal support under this Section, may be asserted until a remedy under Section H above has been exhausted.***
>
> \* \* \*
>
> **IV. <u>Spousal Support or Alimony</u>.**  None.  Spousal support is waived by both parties.
>
> \* \* \*

(doc. # 22, Ex. 1) (emphasis in original). The parties attached to the Agreement an Exhibit A titled the "Proposed Community Property Division Spreadsheet" (doc. # 30, Ex. 1). Exhibit A is a list of the marital debts showing their allocation between the Debtor and Ms. Burke. Included on Exhibit A is the debt at issue, a Wells Fargo line of credit (the "Wells Fargo debt"), which had a balance of $63,157.00 on Exhibit A, reflecting the amount depicted on the April 10, 2004 account statement. Exhibit A shows that the Debtor assumed the Wells Fargo debt.

On April 21, 2010, almost exactly six years after his divorce, the Debtor filed a petition for bankruptcy relief and listed the Wells Fargo debt, with a balance of $53,656.00, on Schedule F (doc. # 1). On June 15, 2010, the Court granted Wells Fargo's motion for relief from the co-debtor stay to collect from Ms. Burke any part of the Wells Fargo debt not paid under the Debtor's chapter 13 plan (doc. # 15). On August 6, 2010, the Court entered the Findings and Order Confirming the Debtor's Plan, which projected a 22% dividend to unsecured creditors (doc. # 19).

In a letter dated June 25, 2010, Wells Fargo notified Ms. Burke that, because the Debtor filed

4

bankruptcy, Wells Fargo intended to collect the balance of the Wells Fargo debt from her as the co-debtor on the account (doc # 22, Ex. 2).  On October 1, 2010, Ms. Burke filed the instant motion for relief from stay (doc. # 22), the Debtor objected (doc. # 23), and the parties submitted supplemental briefs in further support of their positions (doc. ## 30, 31, and 32).

LEGAL ISSUES PRESENTED

Does the Debtor's assumption of the Wells Fargo debt with corresponding hold harmless language – a debt that would otherwise be treated as a property settlement in a bankruptcy case – become entitled to treatment as a domestic support obligation by virtue of the terms of the parties' divorce Agreement?  If so, may Ms. Burke seek a modification of the Agreement to impose a support obligation on the Debtor and a qualified domestic relations order to enforce her support obligation against the Debtor without violating the automatic stay created by 11 U.S.C. § 362(a)?[1]

DISCUSSION

While the automatic stay imposed by § 362(a) bars most actions against the debtor or property of the debtor's estate, the automatic stay does not bar a proceeding against the debtor "for the establishment or modification of an order for domestic support obligations."  11 U.S.C. § 362(b)(2)(A)(ii).  Furthermore, the automatic stay does not bar "actions to collect a domestic support obligation from property that is not property of the estate."  11 U.S.C. § 362(b)(2)(B).  Here, Ms. Burke seeks a determination that the stay does not bar the relief set out in her motion because she seeks to institute an action in state court to establish her right under the Agreement to collect support (in light of the Debtor's default of the hold harmless provision and his filing of this bankruptcy case), and she seeks to obtain a qualified domestic relations order ("QDRO") to enforce that domestic support obligation from exempt property.  The Debtor responds that the Wells Fargo debt is not a domestic support obligation; it is instead a part of a property settlement between the parties and thus dischargeable, and Ms. Burke is thus enjoined from collecting it from any of the Debtor's assets.[2]

The dispute in this matter turns on whether the Debtor's assumption of the Wells Fargo debt

---

[1] All statutory citations refer to Title 11 of the United States Code (the "Bankruptcy Code") unless otherwise indicated.

[2] The Debtor also objects to the motion for relief from stay on the basis that Ms. Burke failed to serve the Debtor personally in addition to servicing the Debtor's attorney, as required by Rule 7004 (doc. # 23).  Due process requires "notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  United Student Aid Funds, Inc. v. Espinosa, 130 S. Ct. 1367, 1376 (2010) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)).  Here, the Debtor had a sufficient opportunity to present his objections, as he filed both an objection and a memorandum of law in opposition to the motion (doc. ## 23, 31).  Accordingly, the Debtor's objection on this basis is overruled.

created a domestic support obligation. To determine whether the bankruptcy filing stays Ms. Burke from proceeding in state court with respect to the Wells Fargo debt "requires a two-fold determination: (1) the court must determine whether or not the debt was for [a domestic support obligation]; and (2) the court must determine whether the property sought to be collected was property of the estate. Both elements must exist or the entity's activity is not excluded from the stay." Chase v. Chase (In re Chase), 392 B.R. 72, 82 (Bankr. S.D.N.Y. 2008). For the reasons set forth below, the Court determines that the Debtor's assumption of the Wells Fargo debt is a domestic support obligation, the §§ 362(b)(2)(A)(ii) and (b)(2)(B) domestic support obligation exceptions to the automatic stay are applicable under the facts at bar, and Ms. Burke therefore is permitted to proceed with a request for a QDRO in the state court and may collect the domestic support obligation the Debtor owes to her from property that is not property of the estate.

## I.    The Debtor's Obligation to Pay the Wells Fargo Debt is a Domestic Support Obligation

Federal bankruptcy law, not state law, determines whether an obligation is a domestic support obligation. See Pauley v. Spong (In re Spong), 661 F.2d 6, 8–9 (2d Cir. 1981); In re Kaufman, 115 B.R. 435, 439–40 (Bankr. E.D.N.Y. 1990). A domestic support obligation is defined in the Code as:

> The term 'domestic support obligation' means a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is —
>
> (A) Owed to or recoverable by—
>     (i)    a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>     (ii)   a governmental unit
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
> (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of —
>     (i)    a separation agreement, divorce decree, or property settlement agreement;
>     (ii)   an order of a court of record; or
>     (iii)  a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
> (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

6

11 U.S.C. § 101(14A).

Ms. Burke's motion only seeks relief from stay. Thus, the Court is not making a dischargeability determination under § 523(a)(5). Nevertheless, in making its determination whether the Wells Fargo debt is a domestic support obligation such that the automatic stay does not apply, the Court will rely upon cases that analyzed § 523(a)(5). Pre-BAPCPA, § 523(a)(5) excepted from discharge a debt owed:

> to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree, or property settlement agreement, but not to the extent that —
> (A) such debt is assigned to another entity, voluntarily, by operation of law, or otherwise (other than debts assigned pursuant to section 402(a)(26) of the Social Security Act); or
> (B) such debt includes a liability designated as alimony, maintenance, or support <u>unless such liability is actually in the nature of alimony, maintenance, or support</u>.

Pre-BAPCPA 11 U.S.C. § 523(a)(5) (2005) (emphasis added). Post-BAPCPA, the former § 523(a)(5) was incorporated into the new definition of "domestic support obligation" found in § 101(14A), and the shorter "domestic support obligation" became the new § 523(a)(5). Therefore, pre-BAPCPA § 523(a)(5) cases examining whether a debt was "in the nature of alimony, maintenance, or support" are relevant and inform the Court's analysis of whether the Wells Fargo debt is a domestic support obligation. See In re Boller, 393 B.R. 569, 574–75 (Bankr. E.D. Tenn. 2008).

The Second Circuit has held that "the intent of the parties at the time of the separation agreement is executed determines whether a payment pursuant to the agreement is alimony, support or maintenance . . . ." Brody v. Brody (In re Brody), 3 F.3d 35, 38 (2d Cir. 1993); see also In re White, 408 B.R. 677, 681 (Bankr. S.D. Tex. 2009) (citing In re Evert, 342 F.3d 358, 368 (5th Cir. 2003)). "If the agreement between the parties clearly shows that the payment was intended as either a property settlement or support, then that interpretation will normally control." In re White, 408 B.R. at 681 (citing In re Evert, 342 F.3d at 368). While courts considering this issue employ variations of a multi-factor test in discerning whether the parties intended the assumption of joint marital debt to be in the nature of alimony, maintenance, or support, this Court considers the following factors to be most important to the analysis:

(1) whether the obligation terminates on the death or remarriage of either spouse;
(2) the characterization of the payment in the decree and the context in which the disputed provisions appear;

7

> (3)  whether the payment appears to balance disparate income;
>
> (4)  whether the payment is due in a lump sum or over time;
>
> (5)  whether the payments are to be made directly to the former spouse or to a third party;
>
> (6)  whether the parties intended to create an obligation of support;
>
> (7)  whether an assumption of a debt or creation of an obligation has the effect of providing the support necessary to ensure that the daily needs of the former spouse and any children of the marriage are met; and
>
> (8)  whether an assumption of debt or creation of an obligation has the effect of providing the support necessary to ensure a home for the former spouse and any minor children.

See In re Kaufman, 115 B.R at 440–41; see also In re Phegley, 443 B.R. 154, 158 (8th Cir. BAP 2011) (describing a 6-factor test); In re Daulton, 139 B.R. 708, 710 (Bankr. C.D. Ill. 1992) (analyzing 20 factors); In re Deberry, 429 B.R. 532, 539 (Bankr. M.D.N.C. 2010) (listing 4 factors, but noting the list is non-exclusive and all relevant evidence should be considered); In re White, 408 B.R. at 681 (employing a 5-factor test). No one factor controls. In re Kaufman, 115 B.R. at 440. "All evidence, direct or circumstantial, which tends to illuminate the parties' subjective intent is relevant." In re Brody, 3 F.3d at 38. "[T]he label that the parties attach to a payment is not dispositive; the court must look to the substance, and not merely the form, of the payments." Id.; see also Jarvis v. Jarvis (In re Jarvis), 2004 WL 2830689, *3–4, 2004 Bankr. LEXIS 2517, *10–11 (Bankr. D. Vt. Dec. 3, 2004).

     With respect to the first factor, whether the obligation terminates on death or remarriage, the Debtor points out that Ms. Burke has remarried and now benefits from the income of her new spouse. However, because the Agreement is silent as the effect of remarriage on the Agreement, the Court cannot conclude that her remarriage changed the nature of the Debtor's obligation to pay the Wells Fargo debt. Additionally, the Agreement does not specifically terminate upon the death of either spouse. In fact, the Agreement requires the Debtor to purchase a decreasing life insurance term policy payable to Ms. Burke in the amount of the debts he assumed. See Agreement, § II.C. The Court views this as evidence that the Agreement contemplated providing necessary support and the means to Ms. Burke to pay off the debts assumed by the Debtor in the event of his death. This factor therefore weighs in favor of a finding that the assumption of the Wells Fargo debt is a domestic support obligation.

     The provisions dealing with the payment of the Wells Fargo debt all fall under the "Property and Debts" section of the Agreement. Within the "Property and Debts" section are provisions relating to the division of community property, the transfer of debts, and a hold harmless provision. See Agreement, §§

II.A, C and H.  Such provisions are classic property settlement provisions, and standing alone these clearly would not lead to a finding that payment of the Wells Fargo debt was in the nature of support.  However, within the same section is the bankruptcy provision, which provides:

> if a party seeks protection under the bankruptcy laws (or state equivalent) or seeks to and does discharge any indebtedness hereunder ("party seeking protection"), and that cause a third party to make a claim against or collect from the other on a debt which the party seeking protection undertakes herein to pay, that action shall have the following results: the duty to pay alimony shall arise thereby.

Agreement, § II.K.  The bankruptcy provision specifically sets forth that the first available remedy shall be a QDRO, with an action for alimony or support as the second remedy.  See Agreement §§ II.H and K.  By including the bankruptcy provision, the parties, who were both represented by counsel in connection with the Agreement, added a mutually available layer of protection for alimony in the event of a bankruptcy filing by the "party seeking protection."  This factor therefore supports a finding that the Debtor's assumption of the Wells Fargo debt constitutes a domestic support obligation.

While Ms. Burke stated in her sworn declaration (doc. # 30-1) that her income at the time of the divorce was approximately $25,000 per year and that that Debtor's income was over $200,000 per year, the Agreement does not specifically refer to the influence of the parties' disparate income.  However, the Agreement does recognize an imbalance in the allocation of the community assets and requires the Debtor to set aside funds from his TIAA-CREF account a lump sum ($600,000) payable to Ms. Burke (not provided as income, but to be placed into her retirement account).  Since the Agreement does not reference disparate income, and the purpose of the allocation of the TIAA-CREF funds is equalization of asset distribution, the Court considers this factor neutral.

The fourth inquiry regarding whether the payment is due over time or in a lump sum is likewise neutral, as the Agreement appears to permit the Debtor to pay the Wells Fargo debt either in a lump sum via refinancing or over time.  The Agreement required the Debtor to "make a good faith attempt to refinance all outstanding debt he assumes pursuant to Exhibit A."  On the other hand, the Debtor was required to purchase a decreasing life insurance term policy sufficient to pay off the debt he assumed, which was to "remain in full force and effect until [he] refinanc[ed] or pa[id] such debt in his name only," indicating an understanding that the payment of the assumed debts can occur over time.

The Debtor argues that, because the payments on the Wells Fargo debt go directly to the lender and not to Ms. Burke, this fifth factor weighs in favor of finding these payments are not in the nature of support.  However, "[b]ankruptcy court decisions have uniformly found hold harmless clauses to create

9

nondischargeable obligations . . . payments in the nature of support need not be made directly to the spouse or dependent to be nondischargeable." Long v. Calhoun (In re Calhoun), 715 F.2d 1103, 1107 (6th Cir. 1983) (citations omitted); see also In re Spong, 661 F.2d at 10–11; In re Johnson, 397 B.R. 289, 296 (Bankr. M.D.N.C. 2008); In re Jarvis, 2004 WL 2830689, *4, 2004 Bankr. LEXIS 2517, *12–14  (Bankr. D. Vt. Dec. 3, 2004) (citations omitted).  Here, the Debtor was a co-debtor on the Wells Fargo debt, and thus it was sensible and most effective for him to make the payments directly to that creditor. Therefore, the Court finds this factor also to be neutral under the facts presented.

The sixth factor is the most essential inquiry to be made in the determination of whether this is a domestic support obligation: the parties' intent.[3]  In the section of the Agreement entitled "Purpose of the Agreement," the parties stated:

> [t]he parties seek by this Agreement to completely settle and adjust the rights, duties and obligations existing between them by virtue of their relationship as Husband and Wife, as well as all matters relating to . . . spousal support and maintenance . . ..

Agreement, § I.D.  In her declaration in support of her motion, Ms. Burke stated that "the intent of the Agreement was to divide our debts and assets equally" (doc. # 30–1, ¶ 9), and that "[she] entered into the Agreement on the express understanding that [the Debtor] would pay [her] alimony if [she] were ever held liable for any of the debts he was assuming" (doc. # 30–1 ¶¶ 11–12, 16).  The Debtor did not file an affidavit or declaration describing his intent at the time he entered into the Agreement.  He argued that "a careful reading of the Agreement shows the intent of the parties was to equalize the distribution of marital properties and liabilities, not income," but provided no reference to the Agreement in support of this argument (doc. # 31).  Additionally, the Debtor argued that "while the Agreement purports to create a support obligation, for all practical purposes, the Agreement merely establishes an alternate method to collect on what is clearly a property settlement." Id.  Further, the Debtor argued that the provision creating an alimony obligation upon the Debtor's bankruptcy filing was "an attempt to circumvent the provisions of the Bankruptcy Code with respect to dischargeable debts," but cited no case law in support of this argument (doc. # 23).  Contrary to the Debtor's contention, parties may create a domestic support obligation by incorporating hold harmless and non-dischargeability bankruptcy provisions into a marital settlement agreement.  See Jensen v. Jensen (In re Jensen), 2006 WL 2589004, *4–5, 2006 U.S. Dist. LEXIS 64159, *10–12 (E.D. Tenn. Sept. 7, 2006).  The Agreement expressly states the parties intended to deal with the issue of spousal support and maintenance, the parties did address spousal support within the

---

[3] The Court notes that the Debtor did not include this factor when citing to the list of factors set forth in Jarvis (doc. # 31).

10

hold harmless and bankruptcy provisions (both found in section II of the Agreement), and the hold harmless and bankruptcy provisions provided for the creation of an alimony obligation to be "remedied" through a QDRO, if possible.  The parties are free to commit to the payment of support under circumstances they agree warrant support, without contravening the Bankruptcy Code.  Based on the terms of the Agreement and circumstances presented, the Court finds that the Debtor and Ms. Burke intended to create a support obligation in the Agreement.

Finally, the Court turns to the last two factors.  These focus on whether the Debtor's assumption of the Wells Fargo debt would have the effect of providing support necessary to ensure the daily needs of the former spouse and/or ensuring a home for the former spouse and any children.  The Court must view this question in light of the circumstances at the time of the Agreement and Divorce Decree, and should not consider changed circumstances of the parties.  See Forsdick v. Turgeon, 812 F.2d 801, 802–03 (2d Cir. 1987).  The key time is the date of the divorce decree because "federal courts should not be in the position of modifying the matrimonial decrees of state courts, thus interfering with the delicate state systems for dealing with dissolution of marriages and the difficult and complex results that flow therefrom."  Id.  The Debtor and Ms. Burke did not have any children, and the Wells Fargo debt is not a mortgage obligation or directly related to housing for Ms. Burke.  The Court therefore directs its attention on whether the Debtor's assumption and payment of the Wells Fargo debt had the effect of providing support necessary to ensure Ms. Burke would be able to meet her daily needs.  At the time of their divorce, Ms. Burke was working part-time as a psychologist earning approximately $25,000 per year, compared to the Debtor's annual salary of approximately $200,000 (doc. # 30–1, ¶ 6).  Ms. Burke stated that "[a]lthough I received roughly 82% of the marital debts, we made up for this imbalance by having [the Debtor] pay me approximately $600,000 (subject to final valuation) from the balance of his retirement saving account . . ." (doc. # 30–1, ¶ 9).  Ms. Burke took possession of the marital home and assumed responsibility for the mortgage on that home, but ultimately could not meet the mortgage payments and sold the home (doc. # 30–1, ¶ 10).  Finally, regarding the bankruptcy provision of the Agreement, Ms. Burke stated that "[b]ecause I was taking on the vast majority of the marital debts notwithstanding my lower income, I knew I needed this protection so that I could have some assurance of being able to continue to meet my own debt obligations, while also meeting my reasonable living expenses" (doc. # 30–1, ¶ 12).  Given Ms. Burke's assumption of debt and significantly lower income, the Court finds that the Debtor's assumption of this debt had an effect tantamount to support because it provided Ms. Burke the financial relief she needed to meet her daily needs.  Therefore, these factors weigh in favor of finding that the Debtor's

11

assumption of the Wells Fargo debt constitutes a domestic support obligation.

In sum, upon consideration of the foregoing factors, the Agreement, and the record in this case, the Court finds that the Debtor's obligation to pay the Wells Fargo debt is a domestic support obligation and is entitled to the protections afforded to such obligations under the Bankruptcy Code.

## II.     An Action to Establish a Qualified Domestic Relations Order Against the Debtor's Retirement Account is Not an Action Against Property of the Estate

Having determined that the Debtor's obligation to pay the Wells Fargo debt was in the nature of a domestic support obligation, the Court must determine whether the property against which Ms. Burke seeks to enforce the debt is part of the Debtor's estate, and consequently whether the proposed action by Ms. Burke requires relief from the automatic stay.

Under section II.H of the Agreement, entitled "Duty to Defend and Hold Harmless," the parties agreed that if the Debtor failed to pay the assumed Wells Fargo debt and Wells Fargo sought to collect from Ms. Burke, the Debtor must then:

> defend [Ms. Burke] against any such claim or demand and that [he would] indemnify, defend and hold harmless [Ms. Burke].

Agreement, § II.H.  Upon the Debtor's failure to defend and hold Ms. Burke harmless, she was entitled to the remedy of obtaining a QDRO to collect from the Debtor's retirement account any amounts due on the Wells Fargo debt.  The parties:

> agree[d] that the use of a qualified domestic relations order shall be the first remedy sought, and no claim for spousal support under [section II.K], below, may be asserted until a remedy under this paragraph has been exhausted.

Agreement, § II.H.  Since the Debtor has filed bankruptcy, it is proper under section II.K that Ms. Burke is seeking a QDRO before making a claim for spousal support from assets other than the Debtor's retirement account.

Here, Ms. Burke's request for a QDRO would give her rights only to the Debtor's retirement account.  The Debtor's TIAA-CREF account is not property of the estate, as the Debtor has properly claimed the balance of the account as exempt on the Schedule C attached to his petition (doc. # 1).  See In re Bennett, 185 B.R. 4, 6–7 (Bankr. E.D.N.Y 1995) (holding that TIAA and CREF plans and supplemental plans are excluded from the debtor's estate).  Thus, § 362(b)(2)(A)(ii) applies in this instance, and the Debtor's filing of this bankruptcy case does not stay Ms. Burke from proceeding to seek an order modifying the Agreement to specify she is now entitled to support pursuant to the bankruptcy provision of the Agreement.  See In re Bowen, , 2010 WL 1855871, *6, 2010 Bankr. LEXIS 1520, *16–18

(Bankr. E.D.N.C. May 7, 2010, as amended May 10, 2010). Moreover, Ms. Burke may seek to collect the domestic support obligation under a QDRO pursuant to § 362(b)(2)(B), as this would be the collection of a domestic support obligation from property that is not property of the estate.

### CONCLUSION

For the reasons sets forth above, the Court finds that the parties specifically considered what remedies would be available to them in the event one party filed for bankruptcy relief, the Agreement unequivocally reflects their intention to have an alimony obligation arise in that event, and the Debtor's promise to pay the Wells Fargo's debt is therefore a domestic support obligation as to Ms. Burke and must be treated accordingly in this bankruptcy case. Therefore, pursuant to §§ 362(b)(2)(A)(ii) and (b)(2)(B), the automatic stay does not preclude Ms. Burke from proceeding to collect this debt from assets that are not property of the Debtor's bankruptcy estate through a request for a QDRO in state court. Thus, the Court grants Ms. Burke's motion to pursue the relief she has requested in the state court.[4]

This constitutes the Court's findings of fact and conclusions of law.

March 29, 2011  
Burlington, Vermont

Colleen A. Brown  
United States Bankruptcy Judge

---

[4] Ms. Burke's argument that approximately half of the current balance of the Wells Fargo debt derives from cash advances the Debtor took after the date of the Agreement (and the Debtor's obligations under section II.C of the Agreement to close the Wells Fargo account and not increase the amounts due) ultimately requires a determination of the dollar amount of the QDRO. That is an issue to be determined by the state court.